UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
CHARLES SPELLS,

        *Petitioner*,

                              **MEMORANDUM AND ORDER**
                              11-CV-1680(KAM)

   -against-


WILLIAM LEE,

        *Respondent*.
----------------------------------X

**MATSUMOTO, United States District Judge:**

        On April 1, 2011, Charles Spells ("petitioner") filed a *pro se* petition for a writ of *habeas corpus*, pursuant to 28 U.S.C. § 2254, challenging his state court conviction on one count of Murder in the Second Degree and one count of Criminal Possession of a Weapon in the Second Degree. (*See* ECF No. 1, Petition.) Plaintiff filed an amended petition on August 13, 2012. (ECF No. 24, Am. Pet.) Petitioner claims that the state failed to disprove his justification defense and that he was deprived of a fair trial due to ineffective assistance of his appellate counsel.[1] For the reasons set forth below, the petition is denied.

---

[1] Plaintiff filed a motion to amend his petition on January 30, 2012, which the court granted in part and denied in part in an Order dated July 23, 2012. (ECF No. 22.) For the reasons stated in the July 23, 2012 Order, the court granted petitioner's motion to amend to add an ineffective assistance of appellate counsel claim and denied petitioner's motion to amend to add an ineffective assistance of trial counsel claim.

Petitioner's conviction, sentence, and the instant petition stem from the shooting and subsequent death of Jean Frank Guillaume ("Mr. Guillaume" or "victim"). On April 18, 2003, at about 9:40 p.m., outside of 829 Schenck Avenue in Brooklyn, New York, the petitioner approached Mr. Guillaume for the purpose of purchasing marijuana from him. (ECF No. 3, Aff. in Opp'n to Pet. for Writ of Habeas Corpus dated 5/24/11 ("Opp.") at 2.) After a brief discussion, the two began to argue, and the argument escalated into a brawl, during which Mr. Guillaume pulled out a knife and sliced the defendant in the back and left arm, and the defendant shot the victim three times: once in the face and twice in the back. (*Id.; see also* Am. Pet. at 6.) The victim was rushed to the hospital, where he died shortly thereafter. (Opp. at 2.) Petitioner asserts that Mr. Guillaume was the initial aggressor who stabbed Mr. Spells in the back without just cause, and consequently, petitioner turned around and shot the victim three times. (Am. Pet. at 6.)

**A. The Trial**

Following his arrest, petitioner was charged with two counts of Murder in the Second Degree (N.Y. Penal Law § 125.25[1], [2]), and one count each of Manslaughter in the First Degree (N.Y. Penal Law § 125.20[1]), Criminal Possession of a Weapon in the Second Degree (former N.Y. Penal Law § 265.03[2]),

and Criminal Possession of a Weapon in the Third Degree (former
N.Y. Penal Law § 265.02[4]. (Opp. at 2; Kings County Indictment
No. 2857/2003.) Petitioner proceeded to trial before a jury in
Supreme Court, Kings County.

During the trial, the prosecution introduced the
testimony of Pierre Michel Guillaume (ECF Nos. 4-5; Trial
Transcript ("Tr.") at 41-48), Police Officer Reginald Miot (Tr.
at 48-91), Police Officer William Friedlander (Tr. at 92-125),
Police Officer Latonji Bishop (Tr. 125-51), Detective David
DelaRosa (Tr. 153-76), criminalist Michelle Miranda (Tr. 176-
95), Detective Charles Reiss (Tr. 196-233), Dr. Florisana
Persechino (Tr. 234-84), Christina Wallace (Tr. 298-328), and
Lisa Desort (Tr. 329-47). The defendant also testified at
trial. (Tr. 349-424). The court summarizes the trial testimony
relevant to deciding the petition for *habeas corpus* herein.

The prosecution called Christina Wallace, who was
looking out of her window from 829 Schenck Ave. on the night of
the shooting. (Tr. at 300-04.) She observed Mr. Guillaume
selling cigarettes in front of her building. (Tr. 305-06.) Ms.
Wallace observed two other men with Mr. Guillaume. (Tr. 311-
12.) After observing the men through her window, Ms. Wallace
walked to her kitchen and then sat in her living room. (Tr.
313.) While in her living room, Ms. Wallace heard three shots
with pauses between each shot. (Tr. 313-14.) When she returned

to the window, she saw Mr. Guillaume alone, face down on the ground. (Tr. 314-15.)

The prosecution also called Lisa Desort, an emergency medical technician ("EMT") for Brookdale Hospital who was the first to arrive to the scene on the night of the shooting. (Tr. 331-32.) EMT Desort testified that when she arrived she found a Mr. Guillaume lying face down[2] at 829 Shchenk Ave. (Tr. 332-33; 341-42.) EMT Desort testified that she noticed some respiration from Mr. Guillaume and immediately flipped him over and noticed that he had a gunshot wound to the chest. (Tr. 333.) EMT Desort testified that she removed Mr. Guillaume's black jacket and white t-shirt. (Tr. 333-34.) Shortly thereafter, police officers arrived to the scene, and Mr. Guillaume was taken in an ambulance to Brookdale Hospital. (Tr. 339.) Officer Friedlander testified that Mr. Guillaume was deceased by the time he arrived at the hospital. (Tr. 96, 106.)

Detective Reiss testified that at the crime scene he gathered Mr. Guillaume's jacket and t-shirt. (Tr. 201—4; 230; see also 132, 146-49.) Detective Reiss testified that he found a deformed bullet underneath Mr. Guillaume's jacket. (Tr. 202.) Detective Reiss also found two .25 caliber shell casings lying

---

[2] Ms. Desort initially testified that Mr. Guillaume was "lying supine meaning face down," providing an incorrect definition of the word supine, which means facing upward. (Tr. 332.) Later on during the direct and cross examination, Ms. Desort corrected herself and confirmed that Mr. Guillaume was lying face down. (Tr. 341-42.)

in a patch of grass to the left of the building stairs and a black nine-inch folding knife with a four inch blade. (Tr. 201-03; 228-29.) The parties stipulated that petitioner's blood was on the knife. (Tr. 296-97.)

The prosecution introduced expert testimony from Dr. Florisana Persechino, a forensic pathologist in the Office of the Chief Medical Examiner of the City of New York ("OCME"). (Tr. 235-36). After entering Mr. Guillaume's autopsy report into evidence, Dr. Persechino testified based on her review of the autopsy report initially completed by Dr. Chauvin who had performed the autopsy on April 19, 2003. (Tr. 238-39.) Dr. Persechino also testified that she viewed the photographs of Mr. Guillaume's body and that she concurred with Dr. Chauvin's conclusions. (Tr. 241-42.)

Dr. Persechino described the three gunshot wounds on Mr. Guillaume's body. (Tr. at 242-46.) Dr. Persechino testified that the shot to Mr. Guillaume's head entered at the right upper eyelid, and the trajectory of the bullet was from front to back, right to left and at a slightly upward angle. (Tr. at 242-44.) Dr. Persechino testified that the stippling present at the entrance wound to the eye indicated that the gun was within eighteen inches of the eye when Mr. Guillaume was shot. (Tr. 242-43.) Dr. Persechino next testified that the autopsy report described a gunshot wound that entered through the back,

traveled through the spinal column and spinal column, and then passed through the aorta and the left lung, and Dr. Chauvin found the bullet within the soft tissues of the left shoulder. (Tr. 244-45.) Dr. Persechino described the path of the bullet as traveling from right side of the back to the left and upward. (*Id.*) The third gunshot described in the autopsy report entered on the left side of the back, traveled through the soft tissues of the back and the diaphragm, went through the spleen, and exited the front of the torso through an exit gunshot wound in the front wall of the abdomen. (Tr. 245-46.) The autopsy report describes the path of this bullet from back to front, right to left and slightly downward. (*Id.*) Dr. Chauvin also examined Mr. Guillaume's clothing and noted that this bullet penetrated the inner lining of his jacket but not the outer lining. (Tr. 247-48.)

Dr. Persechino testified that the autopsy report did not imply a particular sequence for the gunshots. (Tr. 248-49.) Dr. Persechino testified that after the shot to the right eye, the victim would have been immediately incapacitated. (Tr. 253.) She also testified that the shot to the spinal cord would most likely have incapacitated the victim instantly, and the victim would have immediately fallen to the ground. (Tr. 254.) Dr. Persechino testified that the third shot to the spleen would not have instantly incapacitated Mr. Guillaume. (Tr. 255.) Dr.

Persechino testified that the injuries were possibly consistent with Mr. Guillaume having been first shot in the head, and shot twice in the back. (Tr. 255.) Dr. Persechino also noted that other scenarios were possible. (Tr. 282.) The autopsy report concluded that the cause of death was "gunshot wounds of the head and torso with perforation of the brain, aorta, spleen, spinal cord." (Tr. 252.)

Detective Delarosa, a ballistics expert, examined the ballistics evidence recovered in connection with the case and determined that the deformed bullet and shell casings recovered at the scene and the bullets recovered from Mr. Guillaume's body were fired by the same gun. (Tr. 164-72.) Detective Delarosa also testified that when a .25 caliber gun fires, the bullet casing usually ejects slightly rearward and to the right. (Tr. 175.)

Criminalist Michelle Miranda, an expert in the field of gunshot residue analysis, examined Mr. Guillaume's jacket and concluded that the absence of melted fibers on Mr. Guillaume's jacket indicated that the gun had not been in contact with Mr. Guillaume's body when he was shot. (Tr. 176-77, 181, 193-94.) Ms. Miranda could not otherwise determine the distance from which Mr. Guillaume had been shot in the back. (Tr. 186-87.)

The petitioner took the stand and testified that he approached Mr. Guillaume, who was leaning against a gate at 829

Schenck Ave., for the purpose of purchasing marijuana. (Tr. 352, 376.) The petitioner testified that he asked Mr. Guillaume for twenty dollars' worth of marijuana who responded that he only had ten dollars' worth. (Tr. 352-53.) The petitioner testified that he called Mr. Guillaume a "fake ass hustler" and the two began to argue. (*Id.*; Tr. 380-83.) Soon thereafter, the petitioner testified that he turned around away from Mr. Guillaume to walk down the steps away from the building. (Tr. 386-88, 416-17.)

The petitioner testified that he heard a click and that Mr. Guillaume grabbed the back of petitioner's hood, choking him, and stabbed him in the upper left side of his back. (Tr. 353-55, 386-91, 407, 409, 413, 417.) The petitioner testified that he dropped to his knees and pushed Mr. Guillaume off with his left arm in an effort to free himself from Mr. Guillaume's hold, and that Mr. Guillaume stabbed the petitioner twice in the left arm near his bicep. (Tr. 354-56, 395, 407, 411-13, 417.)

The petitioner testified that he then pulled his .25 caliber semi-automatic handgun from his back pocket, which he knew was loaded and ready to fire. (Tr. 356-57, 384-86, 392-93.) The petitioner testified that while Mr. Guillaume was still behind him, the petitioner twisted toward his left, and with the gun in his right hand, fired over his left shoulder at

Mr. Guillaume.  (Tr. 357, 392-94.)  The petitioner testified that he did not know how many times he shot the gun but fired until he heard Mr. Guillaume falling and the gun stopped firing. (Tr. 357-58, 393-99.)  The petitioner then ran away from the scene, threw his gun, and caught a ride to Brookdale hospital. (Tr. 358-60.)

## B. Verdict and Sentencing

The trial court submitted instructions for intentional Murder in the Second Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree. (Tr. 506-14, 514-16, 516-18.)  On February 16, 2005, the jury returned a verdict finding the defendant guilty of Murder in the Second Degree and guilty of Criminal Possession of a Weapon in the Third Degree.  (Tr. 547-48.)  The jury found the defendant not guilty of Criminal Possession of a Weapon in the Second Degree. (Tr. 547-48).  On June 1, 2005, the court sentenced the petitioner to twenty years to life for Murder in the Second Degree, and a concurrent five year term for Criminal Possession of a Weapon in the Third Degree.  (Sentencing Tr. 25).

## C. Post-Conviction Proceedings

Petitioner appealed his conviction to the Appellate Division of the New York State Supreme Court, Second Department, contending that the prosecution failed to disprove his

justification defense beyond a reasonable doubt, and that the verdict was against the weight of the evidence. *See* ECF No. 3-2, Brief for Appellant dated October 2008; *see also People v. Spells*, 886 N.Y.S.2d 625 (N.Y. App. Div. 2009). The Appellate Division rejected petitioner's arguments and held that, because petitioner did not make a specific objection at trial to the sufficiency of the proof regarding the justification defense, the matter was unpreserved for appellate review pursuant to CPL 470.05. *Spells*, 886 N.Y.S.2d 625. After conducting an independent review of the weight of the evidence, the court also found that the verdict of guilt was not against the weight of the evidence. *Id.* Petitioner sought leave to appeal to the New York Court of Appeals, but petitioner's leave to appeal was denied. *People v. Spells*, 13 N.Y.3d 910 (N.Y. 2009). Petitioner filed the instant petition in April 2011 claiming that the prosecution failed to disprove his justification defense and that the verdict was against the weight of the evidence.

Petitioner applied to the Appellate Division for a writ of error *coram nobis* on the ground of ineffective assistance of appellate counsel. *People v. Spells*, 930 N.Y.S.2d 912 (N.Y. App. Div. 2011). Petitioner's application was denied on October 11, 2001. *Id.* Petitioner sought leave to the New York Court of Appeals on the same grounds, but on July 12, 2012,

his leave to appeal was denied. *People v. Spells*, 19 N.Y.3d 977 (N.Y. 2012).

On January 30, 2012, petitioner filed a motion to amend his pending *habeas corpus* petition to add claims of ineffective assistance of appellate counsel and ineffective assistance of trial counsel, and to stay the petition until he was able to exhaust the aforementioned claims in state court. (ECF No. 15.) Petitioner's motion to amend with respect to the ineffective assistance of appellate counsel claim was granted. (ECF No. 22, Order Adopting in Part and Modifying in Part Report and Recommendation.) Petitioner's motion to amend to add his ineffective assistance of trial counsel claim was denied, because petitioner failed to establish good cause for failing to exhaust that claim. (*Id.* at 14.)

Petitioner filed his amended petition on August 13, 2012 claiming that the prosecution failed to disprove petitioner's justification defense beyond a reasonable doubt and that his appellate counsel was ineffective for failing to make an objection to the admission of the autopsy report. (ECF No. 24.)[3]

---

[3] In his initial petition filed on April 1, 2011 (ECF No. 1), petitioner asserted that the jury verdict was against the weight of the evidence but did not raise the claim in his amended petition filed on August 13, 2012. (ECF No. 24.) Comparing the initial petition to the amended petition, the court finds that plaintiff clearly intended to drop his claim asserting that his verdict was against the weight of the evidence. (*Compare* ECF No.1, Pet. at 6 *with* ECF No. 24, Am. Pet. at 6.) Consequently, the court does not construe the petitioner to have alleged the claim that the verdict was against the

<u>**STANDARD OF REVIEW**</u>

**A. Procedural Default and Adequate and Independent State Grounds**

A federal court "will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Downs v. Lape*, 657 F.3d 97, 101-02 (2d Cir. 2011) (quoting *Cone v. Bell*, 556 U.S. 449, 465 (2009)); *see also Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Federal review is barred whenever "a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990).

Additionally, in order for a procedural bar to qualify as adequate to preclude review by the federal court, it must be "based on a rule that is firmly established and regularly followed by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (internal citations and quotation marks omitted). "New York's contemporaneous objection rule requires a party to object to what he or she believes is a legal error in a

---

weight of the evidence. In any event, a weight of the evidence claim is "an error of state law, for which *habeas* review is not available." *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006); *see also Douglas v. Portuondo*, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002).

trial court's ruling or instruction 'at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same.'" *Gutierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012) (quoting N.Y. Crim. Proc. Law § 470.05(2)). A party procedurally defaults if it fails to make a contemporaneous objection, and the issue is unpreserved for appeal as a result. *Id.*

State procedural default or failure to exhaust state court remedies will operate as a bar to review unless the petitioner can (1) establish cause for his default and actual prejudice resulting from the alleged violation of federal law, or (2) demonstrate that the failure to consider the petitioner's claims would result in a fundamental miscarriage of justice. *See Gutierrez*, 702 F.3d at 111; *Carvajal*, 633 F.3d at 104.

As to demonstrating cause and prejudice, a petitioner may fulfill the cause requirement in two related ways. First, the petitioner can demonstrate that "some objective factor, external to Petitioner's defense, interfered with his ability to comply with the state's procedural rule." *Id.* (citing *McClesky v. Zant*, 499 U.S. 467, 493 (1991)). Alternatively, the petitioner can establish cause by demonstrating futility -- specifically, that "prior state case law has consistently rejected a particular constitutional claim." *Id.* (citing *DiSimone v. Phillips*, 461 F.3d 181, 191 (2d Cir. 2006)).

To establish prejudice, the petitioner must demonstrate that the alleged error resulted in "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotation marks and citation omitted).

Even if the petitioner is unable to establish cause and prejudice, the procedural default may be excused if he can show that a fundamental miscarriage of justice would result, *i.e.*, "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citations omitted). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (alteration in original) (quoting *Bousley v. United States,* 523 U.S. 614, 623 (1998)) (internal quotation marks omitted).

**B. AEDPA Deference to State Court Decision on the Merits**

When a claim is exhausted and no other procedural bar applies, a court will consider the merits of the claim under the standard set out in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under this standard, a court may grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" only if the state court decision was "contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme

Court of the United States" or "was based on an unreasonable

determination of the facts in light of the evidence presented in

the State court proceeding."  28 U.S.C. §§ 2254(d)(1)-(2).

Unless the petitioner rebuts the state court's factual findings

by clear and convincing evidence, the court must presume all

state court factual determinations are correct.  28 U.S.C. §

2254(e)(1).

### DISCUSSION

**A.    Justification Defense**

    1. Procedural Default

Petitioner's appeal to the Appellate Division of the

New York State Supreme Court was denied because petitioner

failed to raise a specific justification objection during his

trial.  *People v. Spells*, 886 N.Y.S.2d 625 (N.Y. App. Div.

2009).  New York Criminal Procedure Law § 470.05 requires a

defendant to raise a specific justification objection during

trial for the issue to be preserved on appeal.  *See People v.

Smiley*, 755 N.Y.S.2d 870 (N.Y. App. Div. 2003) ("The defendant's

contention that the People failed to disprove his justification

defense beyond a reasonable doubt is unpreserved for appellate

review.") (citing N.Y. CPL 470.05).

Defendant raised three motions to dismiss at trial: a

motion to dismiss "for failure to prove a prima facie case" at

the close of the prosecution's case-in-chief (Tr. 348); another motion that was described as "the same motion" at the conclusion of all the evidence (Tr. 438-39); and a motion to overturn the jury verdict as "repugnant" on the ground that the petitioner was found guilty of murder in the second degree but not guilty of criminal possession of a weapon in the second degree. (Tr. 548-50.)

Under New York law, a "general objection is not sufficient to preserve an issue since such would not alert the court to the defendant's position." *Garvey v. Duncan*, 485 F.3d 709, 714 (2d Cir. 2007). When a defendant "fails to make a timely objection in conformity with state procedural law, and the claim is, as a result, not determined on its merits, the claim cannot subsequently be entertained in a federal *habeas corpus* proceedings." *Dudley v. Dalsheim*, 526 F. Supp. 88, 92 (S.D.N.Y. 1981) (wherein a failure to object pursuant to § 470.05 constituted grounds for a procedural bar on 28 U.S.C. § 2254 proceedings); *see also Fore v. Ercole*, 594 F. Supp. 2d 281, 288-90 (E.D.N.Y. 2009).

Petitioner does not demonstrate any objective factor or futility to constitute cause for the default.[4] Furthermore,

---

[4] Plaintiff's allegation of ineffectiveness of his trial counsel does not constitute a "cause" here. *See Coleman* v. Thompson, 501 U.S. at 753 ("Attorney ignorance or inadvertence is not a 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the

petitioner was not prejudiced and no miscarriage of justice will result, because as discussed in detail *infra*, the evidence presented at trial disproved petitioner's justification defense beyond a reasonable doubt.

## 2. Legal Insufficiency

Despite the procedural bar, the court nonetheless considers petitioner's argument there was sufficient evidence to disprove petitioner's justification defense in an abundance of caution. As an initial matter, the court applies the "unreasonable application of clearly established federal law" standard as set forth in 28 U.S.C. § 2254, because the Appellate Division adjudicated defendant's legal sufficiency claim on the merits. The Appellate Division stated "[i]n any event, viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to disprove the defendant's justification defense beyond a reasonable doubt." *People v. Spells*, 886 N.Y.S.2d 625. The Appellate Division's alternative ruling on the merits constitutes an adjudication on the merits for the purposes of AEDPA. *See Zarvela v. Artuz*, 364 F.3d 415, 417 (2d Cir. 2004).

AEDPA requires this court to assess whether the state court decision was either: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law,

litigation, and the petitioner must 'bear the risk of attorney error.'") (citations omitted.)

as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The Appellate Division's decision in petitioner's criminal case was neither.

A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction.  *Einaugler v. Supreme Court of the State of N.Y.,* 109 F.3d 836, 840 (2d Cir. 1997).  To overturn a conviction based on insufficiency of the evidence, a court must find that, "viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  "[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable."  *Parker v. Matthews*, 132 S. Ct. 2148, 2152, 183 L. Ed. 2d 32 (2012) (citation and quotation marks omitted). Even when "faced with a record of historical facts that supports conflicting inferences, [this Court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Wheel v. Robinson,* 34 F.3d

60, 66 (2d Cir. 1994).  Thus, "[a] habeas court will not grant relief on a sufficiency claim unless the record is 'so totally devoid of evidentiary support that a due process issue is raised.'"  *Sanford v. Burge,* 334 F. Supp. 2d 289, 303 (E.D.N.Y. 2004) (quoting *Bossett v. Walker,* 41 F.3d 825, 830 (2d Cir. 1994)).

When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir. 1999).  A person is guilty of second-degree murder when "[w]ith intent to cause the death of another person, he causes the death of such person . . ."  N.Y. Penal Law § 125.25(1).  Under New York Penal Law § 35.15, "a person '*may*' use physical force to defend himself or a third person, and his conduct, which would otherwise constitute an offense, is simply not criminal."  *People v. McManus*, 67 N.Y.2d 541, 545-46 (N.Y. 1986) (emphasis in original) (citations omitted).  The prosecution has the burden of disproving beyond a reasonable doubt a defendant's use of force was justified.  *Id*. Justification, however, is not a defense to the use of deadly physical force unless the actor reasonably believed that another person was about to use deadly physical force against him and the actor was unable to retreat safely.  N.Y. Penal Law § 35.15(2)(a); *see People v. Russell*, 91 N.Y.2d 280, 290 (N.Y.

1998); *People v. Goetz*, 68 N.Y.2d 96, 106 (N.Y. 1986). "The duty to retreat reflects the idea that a killing is justified only as a last resort, an act impermissible as long as other reasonable avenues are open. This has been true throughout New York's statutory and decisional law, which in turn grew out of the common law." *People v. Jones*, 3 N.Y.3d 491, 494-95 (N.Y. 2004).

It is well established that "[e]ven if a defendant is justified in using deadly physical force at the beginning of a single, ongoing encounter with an assailant, his right to use that force terminates at the point he can no longer reasonably believe the assailant still poses a threat to him." *People v. Del-Debbio*, 554 N.Y.S.2d 28 (N.Y. App. Div. 1997); *People v. Colecchia*, 674 N.Y.S.2d 106 (N.Y. App. Div. 1998) (same); *see also Davis v. Strack,* 270 F.3d 111, 125 (2d Cir. 2001) (Under New York law, "[i]f the defendant reasonably believes . . . that it is necessary for him to use deadly physical force to defend himself, then the defendant is justified in using deadly physical force against the other person, but only to the extent he reasonably believes necessary to defend himself.") (interpreting N.Y. cases); *People v. Holmes*, 829 N.Y.S.2d 315 (N.Y. App. Div. 2007) (jury could reasonably have concluded that, after disarming victim, defendant had opportunity to retreat safely without using deadly force, or, alternatively,

that because defendant shot victim three times, and each shot was debilitating or deadly, he used excessive force, and that the excessive force caused the victim's death); *People v. Reeder*, 618 N.Y.S.2d 839 (N.Y. App. Div. 1994) (assuming arguendo that defendant's initial shot was justified, jury could have concluded that subsequent shots, when victim was falling and then was immobile on the ground, constituted an excessive use of deadly force, and that it was the excessive portion of the force which caused the victim's death).

Here, viewing the evidence in the light most favorable to the prosecution, a jury could reasonably have found that the prosecution disproved the petitioner's justification defense beyond a reasonable doubt. A jury could reasonably have found that even if the petitioner was not the initial aggressor and that his first shot was justified, the subsequent shots were not justified. As an initial matter, Dr. Persechino testified that the shot to Mr. Guillaume's face and the shot through Guillaume's spine each individually would have incapacitated the victim instantly. (Tr. 253-54.) Consequently, regardless of the order of the shots, Mr. Guillaume would have been on the ground and helpless when the defendant fired the third shot. Since the third shot was clearly an excessive use of force, and Mr. Guillaume's death was caused by all three wounds (Tr. 252), the jury could rationally have concluded that Mr. Guillaume died

as a result of unjustifiable force.  *See, e.g.*, *People v. Postell*, 629 N.Y.S.2d 480 (N.Y. App. Div. 1995) (finding verdict of guilt was not against the weight of the evidence when defendant continued shooting even after the victim had fallen).

The following evidence further supports the jury's determination:  Ms. Desort testified that she found Mr. Guillaume face down (Tr. 341-42); Ms. Wallace testified that she heard pauses between each shot (Tr. 313-14); the autopsy report noted that Mr. Guillaume was shot twice in the back (Tr. 244-56) and noted that the bullet that exited Mr. Guillaume's body penetrated the inner lining of his jacket but not the outer lining; and Detective Reiss testified that he found a deformed bullet underneath Mr. Guillaume's jacket (Tr. 202).  Viewing the evidence in the light most favorable to the prosecution, the jury could have reasonably determined that the petitioner first shot Mr. Guillaume in the face when Mr. Guillaume was stabbing the petitioner from behind, and that thereafter Mr. Guillaume fell face down, at which time the petitioner turned around and shot Mr. Guillaume twice in the back.  The shell casings found to the left of the stairs, in light of Mr. Delarosa's testimony that shell casings usually fall rearward and to the right, are also consistent with this account.  The evidence of the deformed bullet found underneath Mr. Guillaume's jacket, which did not pierce the outer lining of the jacket, supports a reasonable

finding that the petitioner shot Mr. Guillaume at least once
when he was already face down on the ground. Consequently, the
court rejects petitioner's claim that the prosecution failed to
adequately disprove his justification defense beyond a
reasonable doubt.

## B.  Ineffective Assistance of Appellate Counsel

The petitioner asserts that his appellate counsel was
ineffective for "failing to make a *Crawford-Melendez-Diaz*
objection to the testimony" of the medical examiner who did not
perform the autopsy and author the autopsy report.[5] (ECF No. 24,
Am. Pet. at 7.) When the prosecution sought to introduce the
victim's autopsy report at trial, Dr. Chauvin, the coroner who
performed the autopsy for the OCME, had relocated to Houston,
Texas. (Tr. 239.) Consequently, the prosecution called Dr.
Persechino, another OCME coroner who reviewed the autopsy report
authored by Dr. Chauvin. (Record at 238.) Dr. Persechino
testified about the autopsy report and provided her opinions on
several aspects of the autopsy. Petitioner claims that his
trial counsel should have objected to the introduction of the
autopsy report as a violation of his Confrontation Clause rights

---

[5] Petitioner argues that the testimony of the Dr. Persechino was improperly
admitted, because she did not perform the autopsy herself. This argument
does not present any claims under the Confrontation Clause, as Dr. Persechino
testified at trial and was cross examined by petitioner's trial counsel. The
court construes petitioner's argument liberally and considers petitioner to
raise an argument that the autopsy report was improperly admitted in
violation of the Confrontation Clause.

under *Crawford v. Washington*, 541 U.S. 36 (2004), and that his appellate counsel should have raised his trial counsel's failure to object in his direct appeal.

The clearly established test for an ineffective assistance of appellate counsel claim is set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (*Strickland* standard applies to claims of ineffective assistance of appellate counsel). Under *Strickland*, the standard for attorney performance is that of "reasonably effective assistance." *Id*. at 688. For counsel to be ineffective, petitioner must "(1) demonstrate that his counsel's performance 'fell below an objective standard of reasonableness' in light of 'prevailing professional norms,'; and (2) 'affirmatively prove prejudice' arising from counsel's allegedly deficient representation." *United States v. Cohen*, 427 F.3d 164, 167 (2d. Cir. 2005) (quoting *Strickland*, 466 U.S. at 668, 688, 693).

First, in applying the performance prong of this standard a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "In attempting to demonstrate that appellate counsel's failure to raise a state claim constitutes deficient performance, it is not sufficient for the habeas petitioner to show merely that counsel

omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). Rather, a petitioner may establish constitutionally inadequate performance by showing "that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Id*. Noting concern that "[i]ntensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client," the Supreme Court held that "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

Second, under the prejudice prong, "[t]he benchmark . . . must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [appeal] cannot be relied on as having produced a just result." *Id.* at 686. "[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the [decisionmaker] would have had a reasonable doubt respecting guilt." *Henry v. Poole*,

409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). Thus, even objectively unreasonable errors on the part of counsel will not result in the setting aside of a judgment in a criminal proceeding if the errors can be shown to have had no effect on the judgment. *Strickland*, 466 U.S. at 691.

The Supreme Court held in *Crawford v. Washington* that testimonial evidence introduced at trial without the possibility of cross examination violated the Confrontation Clause of the Constitution unless the declarant was unavailable and there was a prior opportunity to cross-examine. *Crawford*, 541 U.S. at 59-61. *Crawford* did not, however, develop a comprehensive definition of testimonial versus non-testimonial evidence. *See id.* at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'") The Supreme Court in *Crawford*, however, did specifically note that the business records hearsay exception was unaffected by the court's new hearsay jurisprudence, as business records were non-testimonial statements. *Id.* at 56.

It was clearly established New York law at the time of petitioner's trial in February 2005 that the duties of the OCME "are, by law, independent of and not subject to the control of the office of the prosecutor," and the agency "is not a law enforcement agency." *People v. Washington*, 86 N.Y.2d 189, 192 (N.Y. 1995). The New York Court of Appeals also noted that

Medical Examiners are required to perform autopsies in certain cases pursuant to New York's Public Health Law, the New York City Charter, and the Administrative Code of the City of New York. (*Id*.) Prior to the petitioner's trial but after the Supreme Court's decision in *Crawford*, the Appellate Division, Third Judicial Department, distinguished reports "supplying indicia of reliability characteristic of a business record" and reports "requested by and prepared for law enforcement for the purpose of prosecution." *People v. Rogers*, 780 N.Y.S.2d 393 (N.Y. App. Div. 2004). The *Rogers* court found that a blood test that was "initiated by the prosecution and generated by the desire to discover evidence against defendant" constituted testimonial evidence. *Id*. In light of the legal landscape at the time of trial, petitioner's trial counsel made a reasonable determination that the autopsy reports were admissible under the business records exception and did not have a constitutional obligation to raise an objection under *Crawford*, which specifically held that business records were excepted.

Before appellate counsel filed his brief in October or November of 2008, the New York Court of Appeals decided *People v. Freycinet* on June 26, 2008, which held that autopsy reports do not constitute testimonial evidence and are admissible under the business records exception. 11 N.Y.3d 38 (N.Y. 2008). Thus, at that time appellate counsel appropriately "winnow[ed]

out" this weak argument that petitioner's trial counsel was ineffective for failing to make an objection that introduction of the autopsy report violated the Confrontation Clause in favor of focusing on arguments that are "more likely to prevail." *Smith v. Murray*, 477 U.S. 527, 536 (1986). The record demonstrates that petitioner's appellate counsel's performance constitutes reasonably effective assistance under *Strickland*.

Petitioner's reliance on *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), which was decided on June 25, 2009, approximately eight months after appellate counsel filed his brief, is unavailing. In *Melendenz-Diaz v. Massachusetts*, the Supreme Court held that certificates of analysis identifying a seized substance as an illicit drug are inadmissible absent an opportunity for the defendant to confront the person who prepared the certificate. *Id*. at 310. As an initial matter, ineffectiveness claims must be judged based on the law at the time of counsel's conduct, and *Melendez-Dias* was decided well after petitioner's trial and the conclusion of the appellate briefing in his case. *Strickland*, 466 U.S. at 690; *see also Mayo*, 13 F.3d at 533 ("Counsel is not required to forecast changes in the governing law."). Furthermore, the Second Circuit decided in *United States v. James*, 712 F.3d 79 (2013), that medical testimony by witnesses who had no role in the autopsy are permissible under the Confrontation Clause. The

Second Circuit held that the appropriate test for determining whether an autopsy report constitutes testimonial evidence turns on whether "the circumstances under which the analysis was prepared, viewed objectively, establish that the primary purpose of a reasonable analyst in the declarant's position would have been to create a record for use at a later criminal trial." *Id*. at 94-95. Consequently, "even after *Melendez-Diaz* the courts have failed to evolve a clear set of rules that would demonstrate the applicability of the Confrontation Clause to preclude the use of [] autopsy report[s]" and "not anticipating the path of the law as it has developed until now, cannot be deemed constitutionally suspect." *Soler v. United States*, 10-cv-4342, 2015 WL 4879170, at *16 (S.D.N.Y. Aug. 14, 2015).

## CONCLUSION

For the foregoing reasons, the application for writ of habeas corpus is denied in its entirety. Because petitioner has not made a substantial showing of the denial of any constitutional right, the court will not issue a certificate of appealability. 28 U.S.C. § 2253; *Lozada v. United States*, 107 F.3d 1011, 1017 (2d Cir. 1997) (abrogated on other grounds); *Richardson v. Greene*, 497 F.3d 212, 217 (2d. Cir. 2007) (discussing the standard for issuing a certificate of appealability). Further, the court certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this judgment denying the

petition would not be taken in good faith. *See Coppedge v. United States*, 369 U.S. 438 (1962). The Clerk of the Court is respectfully requested to dismiss the petition, enter judgment in favor of respondent, serve a copy of this Memorandum and Order and an appeals packet upon petitioner and note service on the docket.

**SO ORDERED.**

Dated:     Brooklyn, New York
           April 4, 2016

                        _____/s/_____
                        **KIYO A. MATSUMOTO**
                        United States District Judge